<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ECUBE SOLUTIONS, LLC<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSAL MASTER PRODUCTS LIMITED, PRINCETON GREEN, LLC, AND ROBERT LOCKWOOD<br><br>Defendants. | Civil Action No. 10-2316 (PGS)<br><br><br>**MEMORANDUM & ORDER** |

This matter comes before the Court on defendants', Universal Master Products ("UMP"), Princeton Green, LLC, and Robert Lockwood, motion for summary judgment. The plaintiff has commenced this suit primarily alleging unfair competition under the Lanham Act and common law to prohibit defendants from utilizing the trademark, eCube, or other marks that are confusingly similar to that mark in association with the sale of commercial refrigeration energy savings devices. ECS has also alleged state law claims for *inter alia* tortious interference and breach of contract. Defendants have also raised counterclaims against ECS for trademark infringement and unfair competition under the Lanham Act as well as state law claims. The Court's analysis focuses on the plaintiff's only federal claim for unfair competition under the Lanham Act. For the reasons outlined below, defendants' motion for summary judgment is denied.

I.     BACKGROUND

UMP is a business entity formed in the United Kingdom and is the manufacturer and patent holder for a commercial refrigeration energy savings device. On April 20, 2007, UMP entered into an exclusive, worldwide distribution agreement with Ecube Distribution, Ltd. ("ECD"), also a U.K. business entity. The distribution agreement granted ECD the right to "re-package or re-label the Product, or sell the Product under UMP's trademarks." Defs. Lamastes Cert. Ex. A; Distribution Agreement, ¶8(a). The agreement also included a "confidentiality and inventions" clause regarding the parties respective intellectual property rights, which stated that

> "UMP is the sole owner of the entire right, title, and interest in and to all trademarks and trade names under which the Product may from time to time be sold to the Distributor (the "Trademarks"). The Distributor shall promptly notify UMP of any infringement of the Trademarks which comes to its notice. The Distributor may use the Trademarks under which the Product[s] are sold solely in a manner which is incidental to the Distributor's role as supplier and promoter of the Product." *Id.* at 12(I).

The agreement further provided that only ECD and "any sub-distributors appointed by the Distributor" could "actively solicit sales or supplies of the Product from a Customer . . ." *Id.* at ¶A. The agreement also included a termination clause, which stated

> "in the event of termination of this Agreement . . . the Distributor shall (at its own cost) do all things necessary to change its corporate and trading names so as not to imply any association with the Product and shall not hold itself out as being associated in any way with the Product; and all licenses granted to the Distributor in respect of use of the name of the Product, any trademarks and patents in respect of the Product and the right to sell and re-sell the Product (other than to UMP, subject to clause 13(g)(ii)) shall be revoked." *Id.* at 13(f).

Upon termination, ECD was required to "immediately cease to use in any manner the Trademarks, or any similar trademark or name, or combination thereof with other marks or names, as well as package designs and trade materials associated with the Product." *Id.* at ¶12(j).

ECS alleges that under the distribution agreement, UMP supplied its product in bulk and ECD repackaged the product under the eCube name and mark and also independently developed instructions for the installation and use of the product.

ECS alleges that as early as summer 2007, and memorialized in a Broker Agreement in February 2008, ECS became "the exclusive company authorized to sign up distributors in North America" to sell and distribute UMP's products as a sub-distributor to ECD. Defs. Massamillo Cert. Ex. A, ECD/ECS Broker Agreement. UMP asserts that they did not authorize ECD's sub-distributorship relationship with ECS.

While the distribution agreement was in effect, ECD filed a trademark application for eCube in the U.K. for the sale of UMP's products on September 3, 2008. ECS alleges that based on its capital commitments and efforts in the distribution and sales of UMP's products in the U.S. under the eCube mark, ECS also filed a trademark application for eCube on April 13, 2009 with the U.S. Patent and Trademark Office ("USPTO"). The trademark was issued in June 2010. In May 2010, ECD assigned its rights to ECS for the eCube mark registered in the U.K.

On September 25, 2009, UMP terminated the distribution agreement with ECD and promptly notified ECS of the termination. UMP asserts that the termination of the distribution agreement with ECD also terminated any rights ECS had to sell the products in the U.S. as ECD's sub-distributor. UMP notes that ECS never had a contract or direct relationship with UMP. Under the distribution agreement, ECD had the right to continue selling its inventory of

UMP products for a six month period following termination of the agreement. After ECD's termination, there were negotiations between UMP and ECS for ECS to serve as an authorized distributor, but no formal agreement was ever reached.

In fall 2009, Princeton Green were in negotiations with ECS to distribute UMP's products in the U.S., known as the eCube. Prior to entering into an agreement, Princeton Green sought assurances that ECS had the right to sell and distribute the eCube product. On October 14, 2009, ECS provided a redacted copy of the Broker Agreement between ECS and ECD. Thereafter, Princeton Green and ECS entered into a non-exclusive dealer agreement ("dealer agreement") on November 4, 2009. Under the dealer agreement, Princeton Green had the non-exclusive right to "purchase, inventory, promote and resell ECS products (as defined below) in the contiguous United States." Princeton Green asserts that they were not informed that UMP had terminated the distribution agreement with ECD, which was ECS' source for the products. Princeton Green further asserts that once they independently learned that UMP terminated the distribution agreement with ECD, they entered into an exclusive distribution agreement with UMP rather than maintain its dealer agreement with ECS.

On April 1, 2010, UMP notified ECD that six months have expired since the date of termination. Under the terms of the distribution agreement, ECD was no longer permitted to sell and distribute any of UMP's products, and UMP was repossessing ECD's remaining inventory.

On May 5, 2010, UMP filed a trademark application with the USPTO for endocube, 3cube, and tcube. Two days later, ECS commenced this suit against UMP alleging unfair competition for attempting to utilize marks that are confusingly similar to the eCube mark, and contesting defendants' challenge to ECS' registration of the eCube mark.

## II.     LEGAL STANDARD

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial"). Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgement. *Anderson*, 477 U.S. at 247-48. If a court determines, "after drawing all

inferences in favor of [the non-moving party], and making all credibility determinations in his favor – that no reasonable jury could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 Fed. Appx. 222, 227 (3d Cir. 2007).

### III. DISCUSSION

#### A. Arguments

UMP relies on the language in the distribution agreement with ECD to argue that UMP has superior rights to the eCube mark. UMP relies on the provisions within the distribution agreement that expressly define the product as the eCube, that UMP was the sole owner of all trademarks under which the products were sold, and that upon termination of the distribution agreement, ECD's rights to use any of UMP's trademarks to sell and distribute UMP's products were revoked, as were ECS' rights as ECD's sub-distributor. UMP argues that ECD's and ECS' use of eCube in their corporate names and as a trademark for the sale of UMP's products were solely granted under the distribution agreement, and its termination revoked ECD's and ECS' right to use any of the marks, including eCube, in which UMP alleges to have ownership. Furthermore, UMP argues that ECS cannot create an independent legal right to the eCube name or mark without any contract rights from UMP.

ECS contends that they have ownership of the eCube mark, because they independently developed and used the mark in commerce in the U.S. whereas ECS asserts that UMP has never used the eCube mark in U.S. commerce. Moreover, ECS argues that UMP has waived any rights to the mark by failing to oppose ECD's trademark application for the eCube mark in the U.K. and belatedly challenging ECS' trademark application for the same mark in the U.S. ECS further argues that UMP expressly waived rights to the eCube mark in favor of marketing the product as

endocube, which ECS argues is confusingly similar in violation of § 43 of the Lanham Act, 15 U.S.C. § 1125(a).

### B.      Unfair Competition

To file an action under § 43(a) of the Lanham Act to assert an unfair competition claim pursuant to 15 U.S.C. § 1125(a), a plaintiff must prove (1) ownership of a valid and legally protectable mark; (2) the defendant used the mark "in commerce"; (3) "in connection with the sale, offering for sale, distribution, or advertising" of goods and services; (4) in a manner likely to confuse consumers.  *800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp. 2d 273, 281-82 (D.N.J. 2006); *see also A & H Sportswear Co. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000).

Section 43(a) of the Lanham Act protects both registered and unregistered marks as trademark rights are based on use and not registration.  *MNI Mgmt., Inc. v. Wine King, LLC*, 542 F. Supp. 2d 389 (D.N.J. 2008) (citing *Duffy v. Charles Schwab & Co., Inc.*, 97 F. Supp. 2d 592 (D.N.J. 2000).  If a mark is federally registered and has become incontestible,[1] then validity, legal protectability, and ownership are proved.  *Commerce Nat'l Ins. Svcs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 n.4 (3d Cir. 2000).   If the mark is unregistered, or if registered but not yet incontestible, then ownership is determined by (1) priority of use and (2) market penetration.  *MNI Mgmt.*, 542 F. Supp. 2d at 405; *see also Commerce Natl'l Ins. Svcs.*, 214 F.2d at 438 ("With respect to ownership of an unregistered mark, the first party to adopt a mark can

---

[1] A mark is incontestible once the owner files affidavits stating that the mark has been registered, it has been in continuous use for five consecutive years since registration, there are no pending proceedings contesting the owner's rights to registration, and there are no adverse decisions concerning ownership or right to registration.  *Commerce Nat'l Ins. Svcs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 n.4 (3d Cir. 2000); 15 U.S.C. §§ 1058, 1065.

assert ownership so long as it continuously uses the mark in commerce." (quoting *Ford Motor Co. v. Summit Motor Prods.*, 930 F.2d 277, 292 (3d Cir. 1991))). To determine priority of use "[a]s between two competing users, the senior user is typically the first to use the trademark anywhere in the United States." *MNI Mgmt.*, 542 F. Supp. 2d at 405.

  Here, the eCube trademark is registered to ECS in both the U.S. and the U.K. by way of an assignment from ECD. Although the mark is registered, it is not incontestible, and so ownership is determined by (1) priority of use and (2) market penetration. UMP has challenged ECS' rights to this mark on the basis of priority of use. However, there is a genuine issue of material fact in dispute as to which party has ownership to the eCube name and mark to satisfy the first element for an unfair competition claim. Specifically, UMP has failed to provide sufficient evidence of prior use as a "senior user" of the eCube mark in commerce in the U.S. UMP references the distribution agreement with ECD that describes its product as an eCube and an invoice used in the U.K., but neither reference demonstrates use of the mark in the U.S. Another issue of material fact in dispute concerning ownership of the mark is whether ECD's right to "re-package and re-label" UMP's product under the distribution agreement permitted ECD to retain legal rights in a mark it alleges to have developed. Similarly, there is a fact question as to whether ECS had the right as a sub-distributor under the distribution agreement to retain legal rights to marks it allegedly developed. The parties are also in dispute as to whether UMP waived its right to the eCube mark in the U.S. based on express statements and untimely challenges to trademark registrations of eCube in the U.S. and the U.K. A final issue is whether UMP's use of endocube, tcube or 3cube in U.S. commerce for the sale of commercial refrigeration energy saving devices is confusingly similar to the eCube mark for similar products.

Considering there are several issues of material fact in dispute concerning the fundamental question of ownership over the eCube mark, summary judgment is inappropriate.

### C. Plaintiff's State Law Claims

Defendants argue that ECS' state law claims should be dismissed because ECS' right to use the eCube mark for the sale and distribution of UMP's products was revoked upon termination of the distribution agreement in 2009. However, the plaintiff's state law claims for *inter alia* tortious interference and breach of contract also depend on which party has legal ownership over the eCube name and mark to protect and enforce those rights. Accordingly, summary judgment is inappropriate as to plaintiff's state law claims as well as defendant, Princeton Green's, state law counterclaims. Additionally, the defendants' have raised counterclaims regarding ECS' right to use the eCube mark. Since those claims are also based on the issue of ownership of the mark, which is a material fact in dispute, summary judgment is also denied as to the counterclaims.

### III. CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is denied as to plaintiff's claims and Princeton Green's counterclaims.

### ORDER

IT IS on this 28th day of March, 2012

ORDERED that defendants' motion for summary judgement is DENIED as to plaintiff's claims and Princeton Green's counterclaims (ECF No. 53).

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.